# DONALD EUGENE LONG v. STATE OF MARYLAND

[No. 378, September Term, 1968.]

*Decided June 18, 1969.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*James F. Garrity* for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William Parsons Fennell, State's Attorney for Kent County, Andrew L. Sonner, Deputy State's Attorney for Montgomery County,* and *Earl C. Hill, Jr., Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

At about 1:00 A.M. on August 5, 1967, an automobile belonging to the wife of Donald Eugene Long, the appellant, was repossessed by a financial institution for the nonpayment of installment obligations thereon. When the company official noticed the rear window of the automobile was broken, and extensive blood stains on the seats, he reported the situation to the Montgomery County Police Department. At or about the same time, but probably thereafter, Detective Lieutenant Thomas Thear received a telephone call from Long, the appellant, stating he had shot Roland Ricketts in self-defense. Subsequent thereto, Long made several statements to the police officers which varied somewhat in details. One of these statements, which was apparently accepted by the jury as being correct, was repeated by Detective Sergeant O. W. Sweat as follows:

> "During this time, he went back over his story, stating that he had met Harold Ricketts in Frederick on the 4th of August, 1967, subsequently had met Roland Ricketts and that he and Roland were planning a job at the Karmax Grocery Store located in Frederick, Maryland. He stated that they were going to 'hit' it. I asked him what he meant by 'hit' since there was a shotgun involved and at that time he stated that they were just going to hit the safe, they weren't going to hold anything up or any of this type crime. He related that he and Roland Ricketts had come to Montgomery County to Piney Meeting House Road earlier for the purpose of finding some tools which the defendant, Long, had previously hidden on Piney Meeting House Road, these being tools that they would use on the safe job. He related that they were unsuccessful in finding the tools and after being unsuccessful in finding the tools, Ricketts had gotten out of the car and test-fired the shotgun a

couple of times, two or three times into the ground and gotten back. They then left this location and proceeded up Route 28 where they stopped at Quince Orchard Diner and Long went in and purchased a [C]ola-[C]ola. Ricketts did not go in the establishment and then they proceeded on on [sic] to where they stopped at Darnestown Texaco and purchased three dollars in gas. After leaving this location they went on north on Route 28 where they hit the intersection of Route 28 and Martinsburg Road. This intersection is completely L-shaped or Route 28 goes completely on a right angle turn. He stated that he missed this curve, went across the road and struck the fence at that location and after doing this, he backed the car out. The car was not damaged beyond being able to drive, the right side being damaged only. Went from this location and at this time Ricketts allegedly told him something. They went to this area, what Mountain area. I asked him if he had asked Ricketts why and he stated that he didn't, that he didn't know why he wanted him to go there and he still didn't know why he wanted to go there, only that Ricketts said he wanted to show him something. They went to this area, what would be Sugar Loaf-Comus Road going by way of Mt. Ephriam Road going out of Montgomery County and going back in Montgomery County where they stopped at an isolated area where there were no houses in view from either direction. At that point, he stated that Ricketts got out of the car, out of the passenger's side, came around on his side of the vehicle and he had gotten out of the car and that Ricketts just walked up and put the shotgun in his chest and stated, 'Now'. He stated that he doesn't know why Ricketts was mad or what Ricketts would do this for. They had had no argument. He related

that he grabbed the gun, got it away from Rick-
etts and when he got it away from him, he fired
at him one time, the shot striking him in the
right arm and stated that at this time the bleed-
ing sounded like when you turn on a faucet.
He related that he tried to apply the tourniquet,
this handkerchief which was around the upper
bicep area of the victim's arm, loaded him into
the car and at that stated that he did not know
whether it was the the right front, the front
seat or the rear seat that he put him into. He
says that he then began coming down the road
and subsequently went to the area of the Piney
Meeting House Road where he took the body out
because he thought the man was dead, left him
laying on the ground and at that time, took the
victim's wallet and identification papers, etc.
and turned the pockets inside out to make an at-
tempt to make it look like a robbery. He advised
that he then drove from this area to his resi-
dence where he went into the house, changed
clothes, had conversation with his wife, cleaned
up, was then going to come out and clean the
car up, however, stated that the car was gone
and assumed that it had just been repossessed
because his wife was behind in the payments
and at that time he placed a call to Lt. Thear.

"Q. Now you were present when he was ques-
tioned before about the wallet?

"A. Yes sir.

"Q. And do you recall what his prior story
was about the wallet?

"A. Yes sir.

"Q. What was that story?

"A. He said he didn't know anything at all
about the wallet, that if he had one it must be
in his car up in Frederick.

"Q. That's the deceased's wallet?

"A. That's the deceased's wallet, yes.

"Q. Then his story changed as you have just related, is that right?

"A. That's correct, sir."

Investigation by the police department revealed that the deceased, Roland Ricketts, had purchased the shotgun with a bank check on August 4, and that the two Ricketts brothers, with some assistance from Long, had sawed off the barrel. There was a large blood spot on the highway at the point where Long stated the shooting had occurred. The body was also found, at the spot indicated by Long, with a wound on the back of the head and a large wound on the interior of the right elbow. A medical examiner testified that the cause of death was the loss of blood through the wound at the elbow. The pockets of the clothing on the body had been turned inside out at the time it was found; and there was no wallet or money on the body of the deceased except for some small change. A bank credit card in the name of the deceased was found near the body. Police officers also located the burglar tools Long and Ricketts were unable to locate on the night in question.

The case was removed from Montgomery County to Kent County for trial. The jury found Long guilty of manslaughter, and Judge George B. Rasin, Jr. imposed a sentence of ten years. On appeal, Long contends there were a number of errors in the trial which will be set out and discussed hereinafter.

On direct-examination, one of the police officers stated that he knew the deceased by "reputation." On cross-examination, it developed that the witness knew the deceased by reputation within the police department but did not know his reputation in the community. The trial court sustained an objection by the State to a question by the appellant's counsel as to what that reputation was. Long contends that this ruling was reversible error. Questions allowed on cross-examination are largely in the discretion of the trial judge, *Holt v. State*, 3 Md. App. 544, 240 A. 2d 355 and *Barger v. State*, 2 Md. App. 565,

235 A. 2d 751. We see no abuse of discretion. By his statement that he did not know the general reputation of the deceased, the witness disqualified himself from giving testimony as to that reputation. Long relies on Wharton *Criminal Evidence*, § 473 (12th Edition) which states that evidence of general reputation of the deceased is admissible where there is some evidence to show that the accused acted in self-defense, and the issue is doubtful, but he ignores that part which states that the reputation must be general reputation and, thus, not a reputation within the police department. See 5 Wigmore *Evidence*, § 1615, *Poff v. State*, 3 Md. App. 289, 239 A. 2d 121 and the Maryland authorities cited therein.

Long contends it was error for the trial judge to instruct the jury, over objection, concerning felony-murder. The instruction was in the following language:

> "In order to elevate the offense to murder in the first degree, the jury must further find from the evidence in this case that the killing of the deceased was willful, deliberate and premeditated or that it was committed in the perpetration of a robbery."

His specific point is that there was no evidence the killing was done in the perpetration of a robbery. The body was found with the pockets turned inside out, and except for some small change, no valuables were found thereon; a bank credit card, belonging to the deceased, was found a few feet away from the body. We think this evidence was sufficient evidence to support the charge. It was incumbent upon the court, when requested, to give an advisory instruction on every question or point of law supported by the evidence. *Bruce v. State*, 218 Md. 87, 145 A. 2d 428, *Tipton v. State*, 1 Md. App. 556, 232 A. 2d 289, Maryland Rule 756. It is well to note there is no requirement the trier of fact accept every detail of an accused's extrajudicial statement as a fact. *Butina v. State*, 4 Md. App. 312, 324, 242 A. 2d 819, note 5.

Long further contends there was no evidence to sup-

port the conviction for manslaughter, and his motion for acquittal on this charge should have been granted. The statement, hereinbefore quoted, as given to one of the police officers, shows Long shot the deceased after he had wrestled the gun from him and thus used more force than was necessary to repel the alleged attack. If this statement is accepted as accurate, it is a textbook case of manslaughter by the use of excessive force, *Morris v. State,* 4 Md. App. 328, 242 A. 2d 582. That the force was unnecessary is especially clear because the record shows that Long was a substantially larger person than the deceased.

Long further contends it was error for the trial judge to impose a sentence consecutive to another he was serving. To support his argument, he cites *Peyton v. Rowe,* 391 U. S. 54, 88 S. Ct. 1549, 20 L.Ed.2d 426 wherein the Court held the district court was not deprived of jurisdiction to entertain a federal habeas corpus petition with reference to a consecutive sentence that had not begun to run. Obviously, the case in no way supports Long's proposition. There is nothing inherently improper about a trial judge imposing a consecutive sentence. *Fisher v. State,* 1 Md. App. 505, 231 A. 2d 720.

Long also raises several other contentions, none of which were submitted to the trial court, and therefore, under Maryland Rule 1085 are not properly before us, but we will discuss each of them briefly.

He alleges error in the failure of the trial court to grant him *sua sponte* a continuance, when on the morning of the trial, he filed a "Motion Ne Recipiatur or to Strike" the State's answer to his "Motion for Discovery and Inspection." It appears that the State's answer was not filed until four days prior to the trial. The trial court found that such relief was unauthorized, and we know of no authority for granting such relief. No continuance was requested, and it was not an error for the trial judge to fail to grant a continuance in the absence of a request.

The next contention concerns the admission of the testimony of the medical examiner as to the distance from

which a shot would have to be fired to create the gunshot pattern found on the deceased. We think the record adequately shows the medical examiner had sufficient experience to qualify as an expert on this subject and to express such an opinion.

Long's next two allegations of error concern the instructions as to burden of proof and reasonable doubt. Although, as stated previously, there was no objection below to these instructions, we have reviewed them and they seem to be generally in accordance with the Maryland cases; there is no clear error in the meaning of Maryland Rule 756g.

Long further alleges that his trial counsel was incompetent. We have consistently refused to consider this allegation on direct appeal since the question was not raised below. *Franklin v. State,* 6 Md. App. 572, 580, 252 A. 2d 487. Long also alleges that the State suppressed evidence, but there is absolutely nothing in the record to support the contention.

*Judgment affirmed.*