# BEASLEY *v.* STATE OF MARYLAND

[No. 238, September Term, 1973.]

*Decided May 1, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*P. Paul Cocoros, Assigned Public Defender,* and *Dennis Henderson, Assistant Public Defender,* for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Appellant, William Beasley (Beasley), was convicted of armed robbery and carrying a concealed deadly weapon by a jury in the Criminal Court of Baltimore. The Court of Special Appeals affirmed in an unreported opinion. We granted certiorari in order that we might consider whether the trial judge prejudicially restricted the right of Beasley to cross-examine a State's witness. Since we conclude that he did, we shall reverse.

The facts of the case were succinctly stated in the opinion of the Court of Special Appeals:

"The victim, Charles Colbert, testified that on July 7, 1972, at 1 a.m., he picked up a girl and three men who were hitchhiking in the City of Baltimore. According to Colbert: 'When I get to 25th and Calvert I say I'm turning here. One guy in the back seat turned and say this is a stick up. I turned around and say you got to be crazy. That's when he slammed me beside the head with this iron pipe. I tried to get out of the car. When I tried to get out the car one jumped out the back seat and took the hammer and busted the front side glass on the driver's seat side.' He stated that 'the young lady tore my pants pocket and the money [$250]

disappeared out of my pocket.' He identified appellant as the man who wielded the hammer.

"The appellant took the stand, denied participating in the robbery stating that he and his wife had attended a movie that evening and later they watched television at the home of a friend, Freddy M. Maddox. His wife and Maddox testified in support of his alibi."

The State called Julie Grabstein as a rebuttal witness under a grant of immunity from prosecution. Her attorney was present in court. He was initially assigned by the Public Defender to represent Beasley. Thirteen days after that assignment, however, he was replaced because of a conflict of interest. Miss Grabstein's story differed somewhat from that of Colbert. She claimed that she met the victim in a bar on Baltimore Street, that they "made an arrangement and [she] took him up to [her] apartment building," and that they entered an unoccupied apartment located on the same floor as her apartment. She thought this was around midnight. As to what then took place, she testified:

"Well, we were in the room and we weren't there but a few minutes, and the door came in, you know — I don't remember if it was left unlocked or if it was just pushed in — and three guys came in, and pushed me out of the apartment and they robbed him. They robbed the dude."

She identified Beasley as one of the three men. She further said:

"They didn't hurt the man or anything. They just went in his pockets. I guess they took his money, you know, but they didn't physically, you know, hurt him or anything."

Miss Grabstein acknowledged that she left the apartment building with the victim's three assailants. She said she drove around with them in what she claimed was Beasley's car.

The record, relative to cross-examination of Miss Grabstein, includes the following:

"Q. Now, those three people that you say were there on July 7th, 1972, what are their names, the three males?

"A. You all know the names, anyway. Why do you have to ask me? I don't have to answer that.

"MR. COCOROS [counsel for the defendant]: Your Honor, she refuses to answer the question.

"THE COURT: I am afraid you must answer the question, Miss Grabstein. Who were the three males, if you knew their names; who were they?

"THE WITNESS: Well, I thought the names were already known, aren't they, Your Honor?

"THE COURT: I don't know. The question is — you're asked to say who they were. I am afraid you will have to answer the question. Who were they, if you know?

"MR. EAGAN [Assistant State's Attorney]: Your Honor, may we approach the Bench?

"THE COURT: Come up. Do you want the reporter here?

"MR. EAGAN: No [sic], Your Honor.

"(Whereupon, there was a discussion at the Bench between the Court and counsel, as follows:)

"THE COURT: Now, Mr. Gilbert, you are her counsel and you are the one who raised the objection to her answering this question, as I understand.

"MR. GILBERT: Yes, Your Honor.

"THE COURT: Yes.

"MR. GILBERT: Yes, Your Honor. The reason why is she has been assaulted. She was assaulted while pending trial in the Baltimore City Jail. She's been threatened by face to face confrontations and by telephone from what she has told me and I believe her, and I feel that her reservation in

testifying at this point, in giving out names, is merely to protect her life.

"THE COURT: You really mean that?

"MR. GILBERT: I really mean this, Your Honor.

"THE COURT: Mr. Cocoros, do you insist on pressing this question?

"MR. COCOROS: I would just like to ask a couple of questions.

* * *

"MR. COCOROS: ... May I get these particular names, Your Honor, and bring them up here?

"THE COURT: No. If you have any questions, ask —

"MR. GILBERT: I don't know the names — I don't know the names. All I know is — I don't know the names. The only thing I do know is that the little clan that they were involved in — they were all friendly at one time — at that time — anybody that was involved in that particular friendship had, either by themselves or through someone else threatened her.

"MR. COCOROS: You don't know who?

"MR. GILBERT: I am sorry, I don't know names. I don't know if it was William Beasley, or —

"MR. COCOROS: What I am trying to point out to Your Honor, is that —

"THE COURT: Are you pressing the question?

"MR. COCOROS: Yes, Your Honor.

"THE COURT: I think if something came up, if she were in fact killed, you would be the one responsible for her death by pressing this question. I will sustain the objection and not require her to answer the question under the circumstances. I wouldn't want you to have that on your head the rest of your life.

"MR. COCOROS: She has mentioned one time Clarence Rogers.

"THE COURT: She has mentioned the name Clarence Rogers as being her boyfriend, the man with whom she shared an apartment.

"MR. COCOROS: Would the Court permit me to ask her if Clarence Rogers was present in the other apartment?

"THE COURT: You may ask her whether Clarence Rogers was present where?

"MR. COCOROS: At the time of the robbery.

"MR. EAGAN: It's irrelevant.

"THE COURT: You are asking the same question in another way. That is all you are trying to do. You are just persisting in asking questions that may lead to a tragedy. I will sustain the objection.

"(Whereupon the conference at the Bench was concluded.)"

The Court of Special Appeals said, in its opinion:

"It is contended that the refusal of the trial judge to compel the witness to give the names of the other two assailants prevented the appellant from showing the bias of the witness and that her testimony was fabricated as well as showing that her motive was to protect those individuals from prosecution and to avenge 'an old score with the appellant.' While it may or may not have been helpful to appellant's case to have the jury know the names of the other assailants, we do not think that the action of the trial judge, under the circumstances here, was so harmful or damaging to the appellant's defense as to amount to reversible error. It is perfectly evident from the other testimony elicited from the witness that she was in the business of prostitution, had recently been convicted of 'soliciting' and that she was a participant in a scheme 'to roll the victim.' All of

this went to her credibility and was before the jury. It is, of course, well established that the latitude or scope of questions propounded on cross examination lie within the sound discretion of the trial judge. *Long v. State,* 7 Md. App. 256. In this instance, we do not think that discretion was abused."

The facts in *Long v. State,* 7 Md. App. 256, 254 A. 2d 707 (1969), differed substantially from those in this case. Judge Thompson there said for the Court of Special Appeals:

"On direct-examination, one of the police officers stated that he knew the deceased by 'reputation.' On cross-examination, it developed that the witness knew the deceased by reputation within the police department but did not know his reputation in the community. The trial court sustained an objection by the State to a question by the appellant's counsel as to what that reputation was. Long contends that this ruling was reversible error. Questions allowed on cross-examination are largely in the discretion of the trial judge, *Holt v. State,* 3 Md. App. 544, 240 A. 2d 355 and *Barger v. State,* 2 Md. App. 565, 235 A. 2d 751. We see no abuse of discretion. By his statement that he did not know the general reputation of the deceased, the witness disqualified himself from giving testimony as to that reputation." *Id.* at 261-62.

The allowance or disallowance of certain questions on cross-examination normally is left to the sound discretion of the trial judge. *Shields v. State,* 257 Md. 384, 392, 263 A. 2d 565 (1970); *Ridgeway, Inc. v. Seidman,* 243 Md. 358, 364, 221 A. 2d 393 (1966); *Shupe v. State,* 238 Md. 307, 310, 208 A. 2d 590 (1965), and cases there cited. Speaking on the subject of cross-examination in *Ridgeway,* Chief Judge Prescott said for the Court:

"[C]ross-examination plays a most important part in the administration of justice in this country. It

has been stated that it is one of the most efficacious tests for the discovery of the truth. *Regester v. Regester*, 104 Md. 1. And, when it relates to the facts in issue or to the issues themselves, it may, within reasonable limits, be pursued as a matter of right. 98 C.J.S., *Witnesses*, § 368. However, its scope, range, and extent are left largely in the sound discretion of the trial court. *Mezzanotte Const. Co. v. Gibons*, 219 Md. 178." *Id.* at 364.

This Court, reversing in *Shupe*, held that the questions propounded were relevant to the issues of whether there had been a theft and whether the appellant was the thief. Judge Sybert there said for the Court:

"The prevailing American rule relating to the scope of cross-examination, which is applicable in Maryland, was stated as follows in *Williams v. Graff*, 194 Md. 516, 522, 71 A. 2d 450 (1950):

'* * * where a witness is called to testify on a particular point, the adverse party in the cross-examination of the witness is restricted to the point on which he testified and cannot question him in regard to other issues in the case. Of course, a party may ask questions on cross-examination to show bias or prejudice in the witness, or to lay a foundation to admit evidence of prior contradictory statements.* * *

'However, our rule does not go to the extent of restricting the cross-examination of the witness to the specific details inquired into on direct examination, but permits full inquiry into the subject matter entered into. Where a general subject has been entered upon in the examination in chief, the cross-examining counsel may ask any relevant question on the general subject.* * * '

"The extension of the rule, mentioned in the second paragraph just quoted, was applied in *Plank v. Summers*, [205 Md. 598, 607-08, 109 A. 2d 914

(1954)]. We think the questions posed in the instant case were permissible under it. The testimony of the State's witnesses, Jenkins, Mosby and the station owner, showed a loose, slipshod method of handling and protecting station receipts. Therefore, a question on cross-examination exploring the possible consequences of such methods was properly within the scope of the direct, and relevant to the case. Although defense counsel apparently did not know what the answers to the questions would be, 'exploratory' type questions are well recognized, *McCormick, Evidence,* sec. 29, p. 55, and to prohibit their use under certain circumstances may be prejudicial, see *Alford v. United States,* 282 U. S. 687 (1931)." *Id.* at 311.

In *Alford v. United States,* 282 U. S. 687, 51 S. Ct. 218, 75 L. Ed. 624 (1931), an individual was convicted of using the mails to defraud. A former employee of the defendant was called by the Government as a witness at the trial. He gave what the Supreme Court described as "damaging testimony with respect to various transactions of accused." Upon cross-examination there was an attempt to ascertain the place of residence of the witness. Objection was sustained on the ground that the questions were immaterial and not proper cross-examination. Mr. Justice Stone said for the Court:

"Cross-examination of a witness is a matter of right. *The Ottawa,* 3 Wall. 268, 271. Its permissible purposes, among others, are that the witness may be identified with his community so that independent testimony may be sought and offered of his reputation for veracity in his own neighborhood, cf. *Khan v. Zemansky,* 59 Cal. App. 324, 327ff.; 3 Wigmore, Evidence (2d ed.) § 1368 I. (1) (b); that the jury may interpret his testimony in the light reflected upon it by knowledge of his environment, *Kirschner v. State,* 9 Wis. 140; *Wilbur v. Flood,* 16 Mich. 40; *Hollingsworth v. State,* 53

Ark. 387; *People v. White*, 251 Ill. 67, 72ff.; *Wallace v. State*, 41 Fla. 547, 574ff.; and that facts may be brought out tending to discredit the witness by showing that his testimony in chief was untrue or biased. *Tla-Koo-Yel-Lee v. United States*, 167 U.S. 274; *King v. United States*, 112 Fed. 988; *Farkas v. United States*, 2 F. (2d) 644; see *Furlong v. United States*, 10 F. (2d) 492, 494.

"Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply. *Knapp v. Wing*, 72 Vt. 334, 340; *Martin v. Elden*, 32 Ohio St. 282, 289. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the. opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. *Tla-Koo-Yel-Lee v. United States, supra; King v. United States, supra; People v. Moore*, 96 App. Div. 56, affirmed without opinion, 181 N.Y. 524; cf. *People v. Becker*, 210 N.Y. 274. To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial. *Nailor v. Williams*, 8 Wall. 107, 109; see *People v. Stevenson*, 103 Cal. App. 82; cf. *Brasfield v. United States*, 272 U.S. 448. In this respect a summary denial of the right of cross-examination is distinguishable from the erroneous admission of harmless testimony. *Nailor v. Williams, supra.*" *Id.* at 691-92.

In *Pointer v. Texas*, 380 U. S. 400, 404, 85 S. Ct. 1065, 13 L.Ed.2d 923 (1965), Mr. Justice Black observed for the Court "that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." There was a specific holding in that case "that the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment." *Cf. State v. Collins*, 265 Md. 70, 75, 288 A. 2d 163 (1972).

In *Smith v. Illinois*, 390 U. S. 129, 88 S. Ct. 748, 19 L.Ed.2d 956 (1968), Mr. Justice Stewart said the question presented was whether Illinois, under the holding in *Pointer*, had denied that right to Smith. He had been convicted in Illinois upon a charge of illegal sale of narcotics. The principal witness against him at that trial was a man who identified himself on direct examination as "James Jordan." He said he had purchased a bag of heroin from Smith with marked money provided by police officers. They corroborated that part of the testimony. Only the witness and Smith testified to the crucial events within the building where the sale was alleged to have taken place. Mr. Justice Stewart observed for the Court:

> "The only real question at the trial, therefore, was the relative credibility of [Smith] and this prosecution witness." *Id.* at 130.

On cross-examination the witness was asked whether James Jordan was his real name. He admitted that it was not. The trial court sustained an objection to the question as to what his correct name was. Later he was asked where he lived. An objection to that question was also sustained. The Supreme Court reversed the conviction, stating:

> "In the present case there was not, to be sure, a complete denial of all right of cross-examination. But the petitioner was denied the right to ask the principal prosecution witness either his name or where he lived, although the witness admitted that the name he had first given was false. Yet when the

credibility of a witness is in issue, the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." *Id.* at 131. (Footnote omitted.)

We find most persuasive here the concurring opinion of Mr. Justice White in *Smith*, in which Mr. Justice Marshall joined. He said:

"In *Alford v. United States*, 282 U.S. 687, 694 (1931), the Court recognized that questions which tend merely to harass, annoy, or humiliate a witness may go beyond the bounds of proper cross-examination. I would place in the same category those inquiries which tend to endanger the personal safety of the witness. But in these situations, if the question asked is one that is normally permissible, the State or the witness should at the very least come forward with some showing of why the witness must be excused from answering the question. The trial judge can then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling. Here the State gave no reasons justifying the refusal to answer a quite usual and proper question. For this reason I join the Court's judgment and its opinion which, as I understand it, is not inconsistent with these views. I should note in addition that although petitioner and his attorney may have known the witness in the past, it is not at all clear that either of them had ever known the witness' real name or knew where he lived at the time of the trial." *Id.* at 133-34.

There have been a number of federal cases decided within

the context of the Sixth Amendment which have attempted to deal with objections to information sought on cross-examination by a criminal defendant where it was claimed that disclosure would subject the witness to danger and the court has attempted to balance the interest in safety of the witness against the criminal defendant's Sixth Amendment right to cross-examination. *See, e.g., United States v. Smaldone,* 484 F. 2d 311, 319 (10th Cir. 1973); *United States v. LaBarbera,* 463 F. 2d 988, 990 (7th Cir. 1972); *United States ex rel. Abbott v. Twomey,* 460 F. 2d 400, 402-03 (7th Cir. 1972); *United States v. Alston,* 460 F. 2d 48, 51-52 (5th Cir. 1972); *United States v. Caldarazzo,* 444 F. 2d 1046, 1050 (7th Cir. 1971); *United States v. Daddano,* 432 F. 2d 1119, 1128 (7th Cir. 1970); *United States v. Persico,* 425 F. 2d 1375, 1384 (2d Cir. 1970); *United States v. Marti,* 421 F. 2d 1263, 1266 (2d Cir. 1970); *United States v. Baker,* 419 F. 2d 83, 87 (2d Cir. 1969); *United States v. Barnett,* 418 F. 2d 309, 311 (6th Cir. 1969); *United States v. Palermo,* 410 F. 2d 468 (7th Cir. 1969); and *United States v. Varelli,* 407 F. 2d 735, 750 (7th Cir. 1969). *Cf. United States v. Cardillo,* 316 F. 2d 606 (2d Cir. 1963). Similar decisions have been rendered by certain of the state courts. *See, e.g., People v. Mascarenas,* 21 Cal. App. 3d 660, 98 Cal. Rptr. 728, 733 (1971); *People ex rel. Dunbar v. District Ct. of Seventh J. D.,* 494 P. 2d 841, 843-44 (Col. 1972); *People v. Finch,* 47 Ill. 2d 425, 435, 266 N.E.2d 97 (1970); *State v. Hill,* 211 Kan. 287, 299, 507 P. 2d 342 (1973); *Commonwealth v. McGrath,* 303 N.E.2d 108, 113-14 (Mass. 1973); and *Winkle v. State,* 488 S.W.2d 798, 800 (Tex. Crim. App. 1972).

We find persuasive the statement in *Palermo:*

"This Court agrees with Justice White that where there is a threat to the life of the witness, the right of the defendant to have the witness' true name, address and place of employment is not absolute. United States v. Varelli, 407 F.2d 735 (7th Cir. 1969). However, the threat to the witness must be actual and not a result of conjecture. Shaw v. Illinois, 394 U.S. 214, 89 S.Ct. 1016, 22 L.Ed.2d 211

(1969). The government bears the burden of proving to the district judge the existence of such a threat.

"An actual threat being shown, the government must also disclose to the district judge *in camera* the relevant information. United States v. Varelli, 407 F. 2d 735 (7th Cir. 1969). Knowing of the existence of an actual threat and the witness' location, the district judge must determine whether the information must be disclosed in order not to deny effective cross-examination. 'The trial judge can then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling.' (White, J. concurring) Smith v. Illinois, 390 U.S. 129, 134, 88 S. Ct. 751 (1968)." 410 F. 2d at 472.

It was conceded by the State at oral argument that the question propounded here was within the scope of direct examination and that there was no basis for objection to the question other than that based upon the safety of the witness. It will be noted that no objection by the State was ever interposed to the question. The objection came from counsel for the witness.

Miss Grabstein described in some detail the incident which it was said constituted the crime for which Beasley was on trial. We do not know what might have been developed had Miss Grabstein been required to identify the other alleged participants. There had been an intimation that the gentleman with whom she occupied an adjoining apartment was one of the participants in the crime. There had been a further intimation that Miss Grabstein bore Beasley some ill will because of some alleged prior misunderstanding. Accordingly, under normal circumstances one would expect counsel to have the right to probe, and probe fully, into Miss Grabstein's version of the incident, including complete identification of the participants.

The safety of the witness should indeed be balanced against the need for full and complete cross-examination.

We have held that trial courts are vested with wide discretion in ruling upon the propriety of questions on cross-examination. To decide this case we need go no further than to hold that the very able trial judge in this case abused his discretion when he concluded that the safety of the witness was in jeopardy since he based that conclusion upon the unsworn, hearsay information furnished by counsel for the witness. Experienced trial lawyers know that clients, be they clients in civil cases or in criminal cases, do not always tell their attorneys the truth. In the exercise of discretion this case is analogous to *Wash., B. & A.R.R. v. Kimmey,* 141 Md. 243, 118 A. 648 (1922). The Court there reversed the refusal by a trial court to consider certain evidence in connection with a motion for a new trial, a matter clearly within the sound discretion of the trial court. Judge Urner said for the Court:

> "The general rule is that the disposition of a motion for a new trial is within the sound discretion of the trial court and is not a subject of appeal. There is a review of the decisions to that effect in the recent case of *Chiswell v. Nichols,* 139 Md. 442. The exception now under consideration, however, is not directed to the action of the court in overruling the motion for a new trial, but to its exclusion of evidence by which its judgment and discretion in regard to the motion should properly have been influenced. The defendant was entitled to the exercise of a sound discretion in the disposition of its motion. A discretion could not be characterized as sound which wholly disregarded evidence by which its exercise should have been aided." *Id.* at 250.

As in that case, the trial judge here failed to have a sound basis for the exercise of his discretion. He could not exercise that discretion in a vacuum. Until he had before him factual information pertaining to the safety of the witness, he had nothing upon which to exercise discretion. The very least that should have been done in this case was to have a

hearing before the judge, out of the presence of the jury, at which Miss Grabstein related under oath the bases for her fears for her personal safety. Then, but only then, could discretion be brought to bear in the balancing of the defendant's right of cross-examination against the safety of the witness. Beasley claimed an alibi. This witness was called in an effort to strengthen the State's case by rebutting that alibi. The credibility of this witness thus became a vital factor as in *Smith v. Illinois, supra.* Accordingly, it was prejudicial error to restrict cross-examination of this witness under these circumstances.

> *Judgments of the Court of Special Appeals and the Criminal Court of Baltimore reversed and case remanded for a new trial; costs to be paid by the Mayor and City Council of Baltimore.*